# EXHIBIT 1

# D.P. VAN BLARICOM

**D.P. VAN BLARICOM, Inc.**
MPA, FBI-NA, CHIEF of POLICE (Ret)
*POLICE PRACTICES EXPERT*
835 – 91ST Lane N.E.
Bellevue, Washington 98004-4811
(425) 453-0082 FAX 453-3263 E-Mail dvbinc@aol.com

### Federal Rule 26 (a) (2) (B)
### REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT
### September 18, 2015

1. My name is D.P. Van Blaricom and I make this report on behalf of plaintiff in the United States District of Wyoming 14-CV-184-S filing of *Flores v. Menig* under my file 15-1869.

2. My law enforcement career, training and experience have spanned over fifty-eight years of active employment to date:
   a. Twenty-nine years of continuous police service, during which I was the Chief of Police of Bellevue, Washington for the last eleven of those years;
   b. Thereafter, I have been engaged as a police practices consultant for an additional twenty-nine years;
   c. The 9th Circuit's decision in *Glenn v. Washington County, Oregon* (2011) describes me as *"… an expert witness, a former Bellevue, Washington Chief of Police with a law enforcement career spanning over 50 years"*.

3. A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A". Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively. My areas of expertise in the police arts and sciences include but are not limited to: police administration, policies, practices, procedures and standards of care; police use of force; internal investigation and discipline. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants throughout the United States.

4. Attorney John Robinson retained my services on August 31, 2015 to review the facts and circumstances of City of Cody Police Department (CPD) Assistant Chief George Menig's (defendant officer) personal search of Juan Flores (plaintiff) on September 30, 2010 (Monday) at approximately 0023 hours (12:23 AM). I have discussed the matter with plaintiff's counsel and this report was prepared in reliance upon the facts and data obtained from my review of the following documents:
   a. Complaint;
   b. Answer;
   c. Park County Sheriff's Office (PCSO) report 10-1276;
   d. CPD reports:
      1) 10-1276,

    2) Internal Incident 13-003;
- e. CPD Field Manual:
  - 1) Procedure 201 – Use of Force Options,
  - 2) Procedure 1303 – Internal Affairs;
- f. Defendant officer's employment application;
- g. Defendant officer's pre-employment psychological assessment;
- h. National Law Enforcement Policy Center:
  - 1) 001 – Use of Force;
  - 2) 007 – Investigation of Employee Misconduct;
  - 3) 031 – Mobile Video Recording Equipment,
  - 4) 062 – Bomb Threats and Searches,
  - 5) 064 – Electronic Control Weapons,
  - 6) 073 – Standards of Conduct.

5. It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a former Chief of Police, career law enforcement officer and nationally recognized police practices expert (see Exhibit "A"). In conducting that evaluation I apply:

- a. My training and experience as a police officer, who was required to conduct searches of detainees in the performance of my law enforcement duties;
- b. My training and experience as a police supervisor, who was assigned to conduct internal investigations;
- c. My training and experience as a police supervisor and commander, who was assigned to train police officers on use of forcvve and patrol procedures;
- d. My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;
- e. My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, discipline and/or terminate police officers;
- f. My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;
- g. My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;
- h. My service as an elected city council member, after my retirement as chief of police;
- i. My continuing training, as is supplemented by an ongoing review of professional publications, that addresses contemporary developments in my areas of expertise (see Exhibit "A" Continuing Training);
- j. Additionally, I have served as a police practices expert in 1,800+ matters of police-related litigation (see Exhibit "A"), wherein I have testified at deposition or trial in hundreds of cases (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.

6. My method of forensic analysis is to compare the specific facts of each case that I review to my training, experience (see Exhibit "A") and recognized professional standards of care:

    a. State and federal appellate court decisions such as *Graham v. Connor* and similar citations,

    b. National Law Enforcement Policy Center model policies and similar publications.

7. My use of certain terms (i.e. – *"negligent"*, *"reasonable suspicion"*, *"probable cause"*, *"objectively reasonable"*, *"reckless disregard"*, *"deliberately indifferent"*, *"duty"*, *"ratified"*, *"unconstitutional"*, etc.) merely reflects my training and experience, in applying reasonable standards of care to police officers' conduct, and does not presume or imply a statement of any legal opinion.

8. Similarly, my use of certain terms (i.e. – *"cyanosis"*, *"petechiae"*, *"apnic"*, *"excited delirium"*, *"carotid"*, *"hyoid"*, *"asphyxia"*, etc.) merely reflects my training and experience in reviewing triage and/or autopsy reports and does not presume or imply a statement of any medical opinion.

9. This incident involved use of force, which I have hereafter briefly discussed for the fact finder's enhanced understanding of actual police practice.

    a. Police officers, police trainers and police practice experts may not express legal opinions on use of force:

        1) But, they are trained to know and understand how much force may be used in the lawful performance of a police duty,

        2) And, *"The law dictates officer training, not the other way around"*, per *Weigel v. WY Hwy Ptl*, 544 F.3d 1143 (10th Cir. 2008), (one of my cases);

    b. Both justification for and limitation on police use of force have been clearly established by the United States Supreme Court, which supercedes any contradictory state statutes or local police policies:

        1) *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. (1985),

        2) *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. (1989);

    c. These seminal use of force decisions are further interpreted by the United States Circuit Courts (1st through 11th), thereby further clarifying legal standards that will be individually applied within each Circuit;

    d. American police officers must comply with these legal standards;

    e. From a police practices perspective, the fundamental issues in any use of force are:

        1) Was force reasonably necessary under the totality of circumstances?

        2) If force was reasonably necessary, was the amount or degree of force used reasonable under the totality of circumstances?

    f. Specific factors that police officers are trained to evaluate, in determining the amount or degree of force to be used, are:

        1) Use of deadly force:

            a) Is there probable cause to believe that a criminal suspect poses an *"immediate"* threat of death or serious physical injury to the officers or others?

- (1) *"Immediate"* means *"taking place right now"*,
- (2) *"Imminent"* means *"about to happen or occur"*,
  - b) And where feasible, has some warning been given?
- 2) All uses of force:
  - a) What is the severity of the crime at issue?
  - b) Does the suspect pose an *"immediate"* threat to the safety of the officers or others?
  - c) Is the suspect actively resisting arrest or attempting to flee?
- 3) Situational factors also affect decision making:
  - a) *"The use of force must be judged from the perspective of a reasonable officer on the scene and not from the 20/20 vision of hindsight"*,
  - b) *"Allowance must be made for the fact that officers are often forced to make split-second judgments, about the amount of force that is necessary in a particular situation, in circumstances that are tense, uncertain and rapidly evolving"*,
  - c) The officer's underlying intent or motivation is irrelevant;
- 4) In all cases, *"the type and amount of force used must be "objectively reasonable under the totality of circumstances"*;
- g. There are varying methods of applying force that may be justifiably used by an officer in response to a reasonably perceived threat and are, in ascending order, as follows:
  - 1) Officer presence,
  - 2) Voice command,
  - 3) Escort or soft hand hold,
  - 4) Intermediate pain compliance – all less-lethal *"pain-inflicting compliance techniques"* must comply with the *Graham v. Connor "objective reasonableness"* standard:
    - a) Hands on (including strikes),
    - b) Oleoresin capsicum (OC pepper) aerosol spray,
    - c) TASER (electronic control weapon),
    - d) Baton,
    - e) Impact projectiles,
  - 5) K-9 bite,
  - 6) Firearm;
- h. An officer is not required to progress sequentially through the afore described *"steps"*, however, and may immediately respond with the appropriate level of force to overcome whatever level of resistance is being encountered on a case by case basis;
- i. As previously explained herein, the only constitutional standard for use of force is *"objective reasonableness under the totality of circumstances"*:

1) Department policy and/or procedure may require a more restrictive use of force but does not create a constitutional standard,

2) *"Negligence"* in any degree does not create a constitutional standard;

10. A 2014 series of highly controversial officer-involved deaths (Ferguson, et al.) have caused further reflection on police use of force and resulted in the publication of additional standards of care by recognized professional authorities (quoted verbatim hereafter), which, since they are based upon cumulative past administrative collective experience, are retroactive:

a. The President's Task Force on 21st Century Policing – 2015:

1) *"Law enforcement culture should embrace a 'guardian', rather than a 'warrior' mindset"* and *"adopt 'procedural justice' as a guiding principle"* that includes *"transparency and accountability"*;

2) *"Policies must reflect community values"*:

a) *"Have clear and comprehensive policies on the use of force, including training on the importance of de-escalation"*,

b) *"Law enforcement agencies should adopt model policies and best practices"*,

c) *"External and independent investigations of officer-involved shootings and in-custody deaths"*,

3) *"The need for expanded and more training has become critical"*:

a) *"Capable to address a wide variety of challenges, including a growing mental health crisis"*,

b) *"Mandatory Crisis Intervention Training (CIT), which equips officers to deal with individuals in crisis or living with mental disabilities"*;

b. The Police Executive Research Forum (PERF) – 2015:

1) *"Training in most departments is inadequate"*:

a) *"Importance of de-escalation and crisis intervention strategies for dealing with mentally ill persons"*,

b) *"Need more 'scenario-based' training about how to respond to the types of incidents they may face, such as a mentally ill person on a street corner waving a knife"*,

2) *"Minimizing use of force is also a question of police 'culture' and the most controversial officer-involved shootings seem to reflect training that has officers think solely about their own safety, rather than a broader approach designed to protect everyone's lives"*:

a) *"Try to 'slow the situation down' when responding to an incident involving an individual experiencing a mental health crisis"* – the **"SLOW IT DOWN"** and **"DE-ESCALATE"** themes are repeatedly cautioned throughout the report!

b) *"Tactical disengagement may be a better outcome than forcing confrontation over a minor conflict"*,

c) *"The so-called '21 foot rule' is too simplistic"* and *"should never be seen as a green light to use deadly force or a kill zone"* – *"distance + cover = time"*,

d) *"Just because your first shot was justified, doesn't necessarily mean that your second shot was also justified"*,

e) Incidentally, *"Why are we putting everybody on the ground and if that's not necessary, why do we do it?"*

3) *"Officers should be held accountable if they failed to de-escalate the situation in order to prevent it from ever reaching the point where the use of force was necessary"*:

a) *"There should be a limit on how many officers can pile onto a suspect"*,

b) *"Tactics are a key component of shooting investigations"*,

c) *"We may have a shooting that's legally justified, but for bad tactics, we would not have been in that situation to begin with"*,

4) *Make a distinction between 'could' and 'should' when evaluating use of force"* and *"just because an officer 'could' use force does not necessarily mean he or she 'should' do so"*,

5) *"Unnecessary use of force is often tied to an officer's adrenalin or anger"*,

6) *"The American Journal of Psychology called Dr. Bill Lewinski's work* (at the Force Science Center/Institute since 2003) *a 'pseudoscience' and the Justice Department denounced his findings as lacking in both foundation and reliability"*,

c. Finally, as the January 2015 edition of LAW and ORDER explained, there is *"no 'officer safety' exception to the United States Constitution"*.

11. My further analysis of this incident will be within the context of the foregoing explanation of police practice for use of force in the United States.

12. This incident involved the use of a TASER, which I have hereafter briefly described for the fact finder's better understanding:

a. The device is an electro-muscular disruption (EMD) and/or electronic control weapon (ECW) system that affects both the sensory and motor nervous systems;

b. Although 50,000 volts of electricity are generated, only a low amperage of .0021 (X26) is delivered;

c. Incapacitation is measured in muscular disruption units (MDUs) of 105 (X26);

d. The TASER may be deployed in any of three authorized configurations:

1) Removal of the cartridge and cycling of the weapon to display a *"spark demo"*, whereby the targeted recipient can observe five seconds of audio-electrical arcing between the two contact

points and be intimidated into compliance, without actual application,

2) Firing a cartridge will discharge two barbed probes at 160+ feet per second (fps) into the recipient's body and create an electrical circuit that will override the central nervous system, to cause uncontrollable contractions of the muscle tissue, and enable handcuffing *"under power"*, while the recipient is rendered temporarily incapable of resistance:

   a) The upper probe is laser sighted to point of impact and the lower probe's trajectory is 8° downward,
   b) Accordingly, the probes spread approximately 1 foot for every 7 feet of distance and the optimum firing range is from 7 to 15 feet away, with the preferable target being the recipient's back,
   c) Should there be insufficient probe spread and/or one of the probes misses or becomes dislodged, a *"drive stun"* (see below) with the cartridge still attached may be used for *"3 point deployment"* (sometimes called *"stapling")* to complete a wider circuit,

3) Alternatively but far less effectively, the device may be applied directly to the recipient's body and fired as a *"drive stun"* for pain compliance only:

   a) Such an application leaves a distinctive signature on the recipient's skin,
   b) That signature consists of 2 *"bum"* marks spaced 1 ½ inches apart,
   c) Many agencies have discontinued use of the *"drive stun"*, because it does not render the recipient incapacitated and may exacerbate further resistance;

e. TASER Training Bulletins (since 2009) advise users to *"avoid targeting the chest";*

f. A pull of the trigger will cycle a five second electric shock, unless the safety is applied during the firing sequence, and subsequent trigger pulls will release successive five second cycles;

g. If the trigger is pulled and held, however, a continuous electrical impulse will occur (in excess of 5 seconds) until the trigger is released;

h. *"Silence is golden":*

   1) If *"arcing"* can be heard, an effective circuit has not been completed,
   2) If *"silent"*, the circuit is complete;

i. The electric shock that results from either actual application configuration is very painful to the recipient;

j. The device records the date, time and duration of each cycle;

k. If the device is equipped with a TASER Cam, it will also preserve a video/audio recording of the deployment sequence;

l. Properly used, the TASER is a welcome and useful addition to options on the continuum of force;

m. Improperly used, the TASER can also be an application of unreasonable force, just as any other weapon in the police arsenal (i.e. pepper spray, firearm, etc.) can be individually abused by a particular officer under circumstances that do not justify such use;

n. It has been judicially determined in *Bryan v. McPherson* (9th. Cir 2009):
   1) Non-lethal is not synonymous with non-excessive,
   2) The TASER is an *"intermediate"* but *"significant"* use of force that *"must be justified by a strong government interest that compels use of such force"*,
   3) Unusual behavior alone does not justify such force,
   4) Officers must *"normally provide a warning where feasible"* and are *"required to consider less intrusive alternatives"*, both of which are *"significant factors"* for determining reasonableness;

o. TASER, International has prepared, published and distributed an Operating Manual to end-users that cautions, *"Make sure your agency has a use-of-force policy that addresses TASER device use and that the policy is clearly addressed during end-user training"*,

p. TASER, International supplements their Operations Manual with mutually consistent training:
   1) *"The important thing to remember is to look at the totality of circumstances, including applicable laws and department policy, and balance injury vs. threat"*,
   2) *"The risk of exposure should be balanced with threat to the officer (s), subject, and the public, as well as, the availability of other force options and the likely outcome of their use"*,
   3) *"Avoid TASER over-dependence"* and *"address any* (such) *concerns early"* by *"reviewing TASER use reports"*;

q. TASER, International has also warned users (since 2006), *"avoid extended or repeated application"*:
   1) *"The application of a TASER device is a physically stressful event"*,
   2) *"Officers should only apply the number of cycles reasonably necessary to allow them to safely restrain the subject"*,

r. TASER model policies have been established and distributed by recognized law enforcement policy and training authorities:
   1) International Association of Chiefs of Police (IACP) and National Law Enforcement Policy Center (NLEPC) 1998, 2004, 2005 and 2010, which explains:
      a) As previously explained herein (i.e. – *"spark demo"*), *"the cartridge can be quickly removed from the device and a visible electric arc displayed in hope of coercing suspect compliance"* because *"these actions have successfully convinced suspects that they should*

submit to officer directions and commands rather than
resist",
   b) The device **"should generally not be used on a
   handcuffed or secured prisoner"**, (emphasis
   supplied),
2) U.S. Department of Justice Office of Community Oriented
   Policing Services (COPS) and the Police Executive Research
   Forum (PERF) 2005 and 2011, which explains:
   a) TASER "should not be seen as an all-purpose weapon
   that takes the place of de-escalation techniques and
   other options",
   b) Like any weapon, "they are not harmless, and the
   potential for injury can be exacerbated by inappropriate
   use and deployment",
   c) The "drive stun mode is of questionable value", such
   use "may even exacerbate the situation by inducing
   rage" and policies "should discourage its use as a pain
   compliance tactic",
   d) From recent experience, "it appears that, in some
   instances, officers are using the device inappropriately
   or too frequently",
   e) A "warning should be given" before using and can
   include "verbalization, display, laser painting, 'arcing', or
   a combination" thereof,
   f) The device **"should not be used on handcuffed
   subjects"** (emphasis supplied),
3) International Association of Directors of Law Enforcement
   Standards and Training (IADLEST) and Public Agency Training
   Council (PATC),
s. I am very familiar with litigation issues, involving the TASER as a use
of force, and have reviewed 74 such cases to date, starting with my
consultation to the federal prosecution in the 1993 Rodney King
matter;

13. Based upon my knowledge, skill, experience, training or education
and a careful evaluation of the totality of circumstances in this matter, it is my
considered professional opinion that the following facts appear to be supported
by the record:
   a. At the time of this incident, defendant officer is described as:
      1) 48 years of age, 5 feet 11 inches tall and 240 pounds,
      2) His pre-employment psychological assessment, conducted 2
      years earlier, appears predictive of his conduct toward plaintiff in
      this matter, as hereafter described:
         a) "When he becomes anxious he tends to over-analyze
         matters overlooking a simple straightforward answer for a
         more complex lower probability answer",

b) *"He may continue to engage in some levels of reckless behaviors that may or may not be explicitly illegal and/or dangerous for the thrill of it"*,

c) *"The New York Police Department* (from which defendant officer retired in 2001 as a lieutenant after 20 years of service) *is likely a rather gritty competitive environment in which an officer adaptively will need to be on their guard and engage themselves very assertively. However, the environment associated with the City of Cody, and its Police Department, strikes this evaluator as a rather different one"*;

b. Plaintiff was intoxicated, carrying a nearly empty pint of vodka and walking in the middle of the street, when he ran toward PCSO Deputy Rayna Wortham's patrol vehicle waving his arms;

c. Plaintiff told her:
   1) *"He was with the Taliban"*,
   2) *"He was going to blow something up"*,
   3) *"He refused to give his name"*;

d. Deputy Wortham called for backup and CPD Officer Tom Caudle arrived, followed by CPD Officers Josh Van Auken and Scott Burlingame;

e. Officer Caudle became primary and handcuffed plaintiff, after which he searched him and had him sit on the ground:
   1) When asked how he was going to blow things up, he replied he had *"nitroglycerine"*, and when asked where it was, he replied that he had *"swallowed it"*,
   2) When he was asked questions about Afghanistan, he had no idea how to answer,

f. As a precaution against detonating a possible explosive device, however:
   1) The officers turned off their radios and moved their vehicles back,
   2) Officer Caudle placed a call to CPD Bomb Technician John Gregory, who agreed to respond;

g. Officer Caudle next called defendant officer, who told him to cancel the Bomb Technician and he would respond himself;

h. Defendant officer:
   1) Was employed by CPD in 2008,
   2) Regularly carries an *"axe handle"* as a *"tool"*, which is not CPD issued or listed in the Field Manual's Use of Force Options;

i. Defendant officer arrived and approached:
   1) He told the CPD officers to turn off their patrol vehicle video cameras,
   2) He told the PCSO deputy to step away and she left;

j.  Plaintiff was still seated on the ground **handcuffed behind his back**, (emphasis supplied) when defendant officer began literally ripping his clothing off of him until he was lying on the ground totally naked;

k.  In so doing, defendant officer:
    1)  *"Lifted plaintiff off of the ground and then dropped him"*,
    2)  *"Dragged plaintiff along the ground"*,
    3)  *"Lifted plaintiff off the ground* (again) *and then he was dropped to the* ground (again)*"*;

l.  Defendant officer next asked Officer Caudle for his TASER, which was given to him;

m.  Defendant officer then told plaintiff to *"open his mouth so I could visually inspect for the presence of an explosive material"* and, when plaintiff refused, defendant officer TASER *"dry* (sic) *stunned"* him in the left lower chest / upper abdomen;

n.  When that electrical shock did not cause compliance, defendant officer next did what he should have done in the first place, he *"spark demonstrated"* the TASER (blue electricity visually and audibly sparks between electrodes), as a warning, and plaintiff opened his mouth to reveal nothing therein;

o.  Plaintiff was transported and booked into the PCSO jail;

p.  All of the witness officers complained to their Sergeant Jon Beck of defendant officer's treatment of plaintiff but the matter was not pursued further;

q.  Unknowingly at the time, PCSO had video recorded defendant officer's interaction with plaintiff and 3 years later that video was provided to City Attorney Scott Kolpitcke, by an unidentified CPD officer, and he in turn provided it to City Administrator Jean Rosencrane;

r.  Thereafter, defendant officer was placed on *"administrative leave"* from November 25, 2013 through March 10, 2014, while the City Administrator and Chief Perry Rockvam conducted an internal investigation 3 years after the fact;

s.  At the conclusion thereof:
    1)  A violation of the CPD Code of Conduct *"regarding the strip search"* was *"sustained"*, which is CPD defined as *"the allegation was supported by sufficient evidence"*,
    2)  A violation of use of excessive force was *"not sustained"*, which is CPD defined as *"there was insufficient evidence to prove or disprove the allegation"*,
    3)  Defendant officer retained his position as Assistant Chief but was specifically warned against taking *"any retaliatory action"* against the witness officers;

t.  Defendant officer, who described his search of plaintiff as merely *"unconventional"*, accepted the discipline *"under protest and disagreement"*.

14.  Based upon my knowledge, skill, experience, training or education and a careful evaluation of the totality of circumstances in this matter, it is my

considered professional opinion that plaintiff was the victim of unreasonable force applied by defendant officer under the totality of these circumstances. In reaching that conclusion I was especially mindful of the following information from the record:

    a. All of the information previously described herein;

    b. Plaintiff was not:

        1) Reasonably suspected of any crime, beyond being intoxicated in public and was more probably than not mentally ill and/or hallucinating:

            a) Officer Caudle described plaintiff as *"intoxicated"* and *"he wasn't making any sense"*,

            b) Officer Van Auken described plaintiff as a *"typical drunk jerk"*,

            c) Officer Burlingame described plaintiff as *"the threat did not seem very plausible"*,

        2) Accordingly, plaintiff did not pose a reasonable threat to the officers or anyone else,

        3) Plaintiff was not resisting or trying to escape;

    c. Defendant officer searched plaintiff in such a manner as to:

        1) Lift him off the ground and drop him twice,

        2) Drag him along the ground;

    d. Plaintiff was seated on the ground and **handcuffed behind his back** (emphasis supplied), when he was TASER *"drive stunned"* by defendant officer for failing to open his mouth upon command:

        1) Such pain compliance amounts to coercive torture and is a prohibited police practice,

        2) Officer Caudle, who was the CPD *"use of force instructor"* , told defendant officer, *"It's enough"* after he TASER *"drive stunned"* plaintiff, while ***"this guy's still handcuffed"*** (emphasis supplied);

    e. Admittedly, if defendant officer really thought plaintiff had an explosive device on or within his totally naked body, *"an electrical charge could set them off"*

    f. All of the witness officers unanimously agreed that they had never seen such behavior before.

    15. Based upon my knowledge, skill, experience, training or education and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the strip search of plaintiff in public was unreasonable under the totality of these circumstances. In reaching that conclusion, I was specifically mindful of the following information from the record:

    a. All of the information previously described herein:

    b. Public strip searches of a detainee are unreasonable per se and a prohibited police practice;

    c. Chief Rockvan's own investigation of this Internal Incident, as the CPD chief policy maker, concluded defendant officer violated the CPD *"Code of Conduct Regarding the Strip Search"*;

      d. Again, all of the witness officers unanimously agreed that they had
         never seen such behavior before.

    16. I am prepared to testify to these opinions at deposition or trial, if called
upon to do so.

    17. If I am provided with further documentation for my review, I may have
additional opinions.

*/s/ D.P. VAN BLARICOM*