

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

**Juan Paul Flores,**

**Plaintiff**

**vs.**                                                       CASE NO.   14-CV-184-S

**George Menig**

**Defendant.,**

## REPORT OF K. THOR EELLS

My name is K. THOR EELLS. All of my conclusions, opinions and observations stated in this report are within my personal knowledge, are based on my law enforcement training and experience, and are based on the matters I personally reviewed.

I am presently employed as a Police Commander with the Colorado Springs Police Department in Colorado Springs, Colorado. I have been employed with the Colorado Springs Police Department for over twenty seven years. During that time I have worked in patrol, investigations and tactical. I have served as a Field Training Officer, Sergeant, Lieutenant and Commander. I have received numerous commendations, the departmental Life Saving Award on four occasions and The Distinguished Service Medal.

I hold a Master's Degree in Criminal Justice from the University of Colorado, Graduate School of Public Affairs.  I also hold police officer certification from the Colorado Commission on Peace Officer Standards and Training. I have been certified for

over fifteen years as a Non-Lethal Use of Force Instructor, SWAT trainer and over twenty seven years as a police officer. I have attended over 3100 hours of various law enforcement seminars and schools throughout the United States and am a graduate of the FBI National Academy.

In my career with the Colorado Springs Police Department, I have studied and attended seminars on the issues of policies and procedures, use of force, use of deadly force, reasonable suspicion, probable cause, police supervision, law enforcement training, patrol procedures, constitutional law, firearms, police officer involved shootings, critical incidents and management and officer safety. I have also instructed classes in the areas of patrol procedures, probable cause, defensive tactics, officer safety, arrest procedures, use of force, use of deadly force, law enforcement policies and procedures, firearms, police supervision, first aid, various SWAT topics and many other subjects. I have been qualified in Federal and State courts as an expert witness in the areas of patrol procedures, use of force, use of deadly force, and non-lethal force.

I am a member of the National Tactical Officers Association and currently serve on the Board of Directors as the Chairman of the Board. I have served on the Department of Homeland Security Committee on SWAT Typing and Tactical Capabilities and DHS Committee on Law Enforcement Typing and Capabilities. I have instructed at the Texas Tactical Police Officers Association Annual Conference (2002-Present), Ohio Tactical Officers Association Annual Conference (2006-Present), Ontario Canada Police College 2006, National Tactical Officers Association annual conference (2007-Present); and

various other locations throughout the United States, Canada, and Europe.

I have technical, professional and other specialized knowledge that will assist a trier of fact in understanding the facts and issues in the above-captioned lawsuit. Specifically with regards to this case, I have extensive patrol and tactical experience. The facts and data on which I base my opinions are of a type reasonably relied upon by experts in the field of law enforcement in forming opinions or inferences there from.

The attached resume contains a more complete listing of my training and qualifications and is provided for reference of my experience, education, training, and skills which is incorporated herein by reference the same as if set forth at length herein.

My fee schedule is; $1,500.00 retainer, $175.00/hour rate for case review and report, $225.00/hour for deposition, $75.00/hour for actual travel time plus actual expenses. My fee schedule is attached for additional details.

**Research and Assessment**

The following is a list of the materials and documents that I was provided for my review and to assist in forming my opinion. As additional information becomes available I reserve the right to amend my opinion as necessary.

1. Menig Personnel File
2. Menig Psychological Exam
3. Rockvam Investigation File
4. Rosebcranse Investigation File
5. Email
6. Flores Medications & Psych Records
7. Van Blaricom's Report

3

8. Video
9. Suicide Bombers: Are You Ready?
10. IACP Model Policies

**Summary of Relevant Facts as Derived from the Evidence Reviewed**

On September 13, 2010, Deputy Rayna Wortham was driving her marked patrol vehicle when she observed a male running toward her in the middle of the roadway. She observed that he was waving his arms, acting strangely and holding a bottle of an unknown liquid. Deputy Wortham ordered the male to stop and noted that he ignored the order and ran toward her while claiming to be with the Taliban. Deputy Wortham also heard the male say he was going to blow something up. Deputy Wortham reversed her vehicle, and advised the male to put the bottle down. The male complied. He refused to give his name despite being asked by the deputy. The male repeated that he was with the Taliban and that he was going to blow something up. Deputy Wortham called for backup. She observed the bottle to have a Vodka label with a small amount of liquid in the bottle. Deputy Wortham did not smell the liquid to determine if it was alcohol or not. Deputy Wortham noted the male was wearing a very large T-shirt, jeans, a baseball cap and shoes. She also observed the male had a "very long straggle beard". Deputy Wortham noted she was not able to tell if the male had any concealed weapons or explosives on him. Officer Caudle arrived as a backup officer and was unable to get the male to tell him his name. Officer Caudle handcuffed the male. Deputy Wortham reported to dispatch the male's claim of

4

having explosives concealed on himself and wanting to blow things up. Additional officers responded to the scene and barricaded the area. The male continued to repeat he was with the Taliban and his threat to blow things up when verbally engaged by other officers. Assistant Chief George Menig responded to the scene to assist. Assistant Chief Menig arrived on scene and was advised the male claimed to have nitroglycerin in his mouth. Assistant Chief Menig directed the male to open his mouth and he (male) refused. Asst. Chief Menig then stripped the male of his clothing to check for any hidden explosives. Asst. Chief did not find any obvious signs of an explosive device. Assistant Chief Menig then ordered the male to open his mouth again and he refused. Menig then administered a "drive Stun" with a Taser to the male. The male still refused to open his mouth. Assistant Chief Menig then "sparked" the Taser for the male to see. The male then opened his mouth. No explosives were found. The male then had the handcuffs removed so that he could dress, was then handcuffed and transported to jail. The male was subsequently identified as Juan Paul Flores. Mr. Flores was charged with Terroristic Threats and Interfere with a Peace Officer.

**Opinions and Observations**

The actions of the Assistant Chief George Menig were analyzed pursuant to what actions a reasonable and prudent law enforcement officer could have taken when presented with the same or similar circumstances that this officer was at the intersection of River View Drive and Highway 120 North on September 13, 2010. The analysis is from the vantage

point of what Assistant Chief Menig knew and perceived at the time, with consideration given to the fact that law enforcement officers at times are required to make split second decisions in tense, dangerous, and rapidly evolving circumstances. The evaluation includes the circumstances surrounding the use of force and search of Juan Paul Flores and whether the officer's actions were reasonable given the totality of circumstances.

**Law Enforcement Functions**

In my professional opinion, the available information indicates that Assistant Chief George Menig was performing law enforcement functions, and more specifically, the functions related to the manner in which he responded to a reported Taliban member threatening to blow things up, at the intersection of River View Drive and Highway 120 North. In the law enforcement profession there is an indefinite number of circumstances that law enforcement officers may encounter when responding to an in-progress call, such as a possible explosives call. Law enforcement officers are trained to evaluate the totality of the circumstances as viewed from their vantage point and to use their judgment and discretion at arriving at a reasonable course of action. When law enforcement officers are assessing and reacting to a situation, officers must use their discretion in deciding what options are appropriate and reasonable under the totality of the circumstances. It is inconceivable that any training manual and/or instruction could address every possible situation that a law enforcement officer may encounter; thus law enforcement officers are required to use their judgment and discretion. Each officer will be influenced by their training, experience, confidence and competence when exercising their judgement and

discretion.

In my professional opinion, the available information indicates that Cody Police Department Assistant Chief George Menig was required to use his judgment and discretion in determining what options were appropriate and reasonable for the circumstances that he and other law enforcement officers were presented with during the call for service at River View Drive and Highway 120 North on September 13, 2010. The assistant chief was performing law enforcement functions which required him to use his personal deliberation, judgment and professional training.

The available information indicates that Assistant Chief Menig was responding to a possible suicidal bomber call. This incident was NOT a normal law enforcement call for service. Suicidal bomber calls are extremely rare and one in which contemporary American law enforcement is ill equipped and trained to handle. With the exception of a few highly trained elite units, the vast majority of American law enforcement receives little or no training in how to respond to a suspected suicidal bomber call. The majority of training and policy development has come from the International Association of Chiefs of Police (IACP) in cooperation with an Assistant United States Attorney from the Northern District of Illinois, Ms. Shari Mecklenburg. One of the key topics of the recommended training and policy development is the fact that these types of calls do not fall within the regular guidelines of normal police practices. The recommended use of force is radically different than that which would be normally used. Whereas the use of deadly force has been instructed as a last resort, in suicidal bomber calls, it is encouraged as an early option. In

July 2005, the IACP issued training keys on suicidal bombers that demonstrate the conflict between traditional policing and confronting terrorism (suicidal bombers). The IACP stresses the fact that a suspected suicidal bomber always presents an imminent threat of death or serious bodily injury to those around them. The training keys emphasize the need for law enforcement to consider and use what would normally be unorthodox measures when dealing with these types of calls. It has been noted in the literature by one expert, David Heyman of the Center for Strategic and International Studies, "that acceptance of these unorthodox means will depend on whether an officer's assessment was correct, a judgement that can only be made in hindsight. There are no guarantees of certainty of a suspect's intentions and capabilities, and many of the signs attributable to suicidal bombers can also be innocent characteristics."

Mr. Van Blaricom notes in his report that plaintiff was not reasonably suspected of any crime. The plaintiff was charged with making Terroristic Threats, a felony. He minimizes the actions of Mr. Flores as being "intoxicated in public, and more probably than not, mentally ill and or hallucinating". This is exactly what the IACP has cautioned against in their training keys for law enforcement officers. The assumption of innocent behaviors while ignoring the threats. My personal training has included the instruction that often suicidal bombers ingest intoxicating substances to assist them in carrying out their criminal acts. In this day and age, an officer no longer has the luxury of dismissing threats of a bomb. The plaintiff in this case presented a real threat until proven otherwise.

8

Assistant Chief Menig used a Taser on the plaintiff in a "drive stun" mode in order to have the plaintiff open his mouth to inspect for the presence of explosives. While this is not an orthodox practice, this was a highly unusual event. In light of the justification for deadly force, it is not unreasonable for an officer to believe that a lower level of force, such as the Taser, would be acceptable.

Assistant Chief Menig did strip Mr. Flores of his clothing. The IACP training advises officers to have a suspected suicidal bomber to remove their clothing. This presumes the suspect is compliant. Training also advises officers to consider the element of surprise in their actions. Assistant Chief Menig advised that he was hoping to catch the plaintiff by surprise when stripping him of his clothing. This was also unorthodox but not unreasonable given the circumstances surrounding this call.

The opinion offered in this report is based upon the information as noted earlier. I may offer additional amended opinions upon the receipt and review of additional information.

_____          _11/10/2015_____
K. Thor Eells                             November 10, 2015

_[signature]_
11-10-2015
State of Arizona
County of Maricopa


Maria D. Martinez
Notary Public - Arizona
Yuma County
My Commission #270114
Expires April 12, 2016

9